DAVID B. CASSELMAN (Bar No. 81657)
   dbc@casselmanlawgroup.com
DAVID POLINSKY (Bar No. 125163)
   dp@casselmanlawgroup.com
KIRK S. COMER (Bar No. 240847)
   ksc@casselmanlawgroup.com
CASSELMAN LAW GROUP
5567 Reseda Boulevard, Suite 330
Tarzana, California 91356
Telephone: (818) 609-2300
Facsimile: (818) 345-0162

FRANK M. PITRE (Bar No. 100077)
   FPitre@cpmlegal.com
JULIE L. FIEBER (Bar No. 202857)
   JFieber@cpmlegal.com
COTCHETT PITRE & McCARTHY LLP
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577

Attorneys for Defendant and Counterclaimant
The Gorilla Foundation and Defendant Dr.
Francine Patterson

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| ZOOLOGICAL SOCIETY OF CINCINNATI, D/B/A CINCINNATI ZOO & BOTANICAL GARDEN, an Ohio non-profit Corporation,<br><br>Plaintiff,<br><br>vs.<br><br>THE GORILLA FOUNDATION, a California Corporation; and FRANCINE PATTERSON,<br><br>Defendants. | CASE NO. 4:18-cv-06529 (RS)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT;**<br><br>**DECLARATIONS OF DR. DAVID SHIELDS, M.D., PIERRE THIVILLON, AMOS COURAGE, DR. PENNY PATTERSON, PH.D., DR. CHRISTA NUNES, PH.D., AND DAVID B. CASSELMAN**<br><br>Hearing date: January 3, 2019<br>Time:      1:30 p.m.<br>Courtroom:  3<br>Judge:     Hon. Richard Seeborg |

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1

## **TABLE OF CONTENTS**

2

3                                                                                              **Page**

4

5

6   INTRODUCTION ........................................................................................................ 2

7   FACTUAL BACKGROUND ....................................................................................... 8

8   LEGAL DISCUSSION ............................................................................................. 10

9   I.      SUMMARY JUDGMENT IS IMPROPER WHERE AFFIRMATIVE
           DEFENSES ARE SUPPORTED BY EVIDENCE. ................................... 10

10
11  II.     THE AFFIRMATIVE DEFENSE OF ILLEGALITY PREVENTS
           SUMMARY JUDGMENT. ........................................................................ 11

12          A.    Unlawful Contractual Conditions Are Void. ................................. 11

13          B.    Pursuant to California and Federal Law, It is Unlawful to    Harm
                 Any Animal, Especially an Endangered Species. .......................... 12

14
15                1.    California Law. ..................................................................... 12

                  2.    Federal Law. ........................................................................ 13

16          C.    Pursuant to Public Policy, It is Unlawful to Harm an Animal,
17               Especially an Endangered Species. ............................................... 14

18                1.    California Public Policy. ...................................................... 14

19                2.    Ohio Public Policy. .............................................................. 15

20                3.    Federal Public Policy. .......................................................... 15

21          D.    The CZBG Requested Transfer of Ndume is Unlawful Since it
                 Violates Express Provisions of Law and is Against Public Policy. ............. 16

22
23  III.    THE AFFIRMATIVE DEFENSE OF IMPRACTICABILITY  PREVENTS
           SUMMARY JUDGMENT. ........................................................................ 20

24          A.    Impracticability Discharges a Contractual Duty of a Party. ......... 20

25          B.    Enforcing the Contract as Requested by CZBG is Impracticable. ............... 21

26  IV.     THE COURT SHOULD ALLOW DEFENDANTS TO CONDUCT
           DISCOVERY UNDER FRCP RULE 56(D). ............................................. 22

27
28  CONCLUSION .......................................................................................................... 25

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

1

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

## TABLE OF AUTHORITIES

2

3                                                                                          **Page**

4

5

6 **CASES**

7 *Altschul v. Sayble*
    (1978) 83 Cal.App.3d 153, 161–162 ................................................................. 14

8
*Animal Legal Defense Fund v. California Exposition & State Fairs*
9     (2015) 239 Cal.App.4th 1286, 1290 ............................................................... 12

10 *Burlington Northern Santa Fe R. Co. v. Assiniboine and Sioux Tribes of Fort Peck
    Reservation*
11     (9th Cir. 2003) 323 F.3d 767, 773 .......................................................... 23, 24

12 *Center for Biological Diversity v. Norton*
    (D. Ariz. 2003) 304 F.Supp.2d 1174, 1178 ................................................ 16

13
*City of Vernon v. City of Los Angeles*
14     (1955) 45 Cal.2d 710, 719–720 ..................................................................... 20

15 *Fouke Co. v. Brown*
    (E.D. Cal. 1979) 463 F.Supp. 1142, 1144 ................................................ 15

16
*Jackson v. Rogers & Wells*
17     (1989) 210 Cal.App.3d 336, 349–350 ....................................................... 16

18 *Kashani v. Tsann Kuen China Enterprise Co.*
    (2004) 118 Cal.App.4th 531, 540 ............................................................... 14

19
*Martinez v. Robledo*
20     (2012) 210 Cal.App.4th 384, 392 .......................................................... 12, 14

21 *Maudlin v. Pacific Decision Sciences Corp.*
    (2006) 137 Cal.App.4th 1001, 1017, fn. 6 ................................................. 21

22
*McCollough v. Johnson, Rodenberg & Lauinger*
23     (D. Mont. 2008) 587 F.Supp.2d 1170, 1176 ............................................ 11

24 *Mineral Park Land Co. v. Howard*
    (1916), *supra*, 172 Cal. 289, 293, 156 P. 458, L.R.A.1916E, 1 ............... 21

25
*State of Cal., on Behalf of California Dept. of Toxic Substances Control v.
26     Campbell*
    (9th Cir. 1998) 138 F.3d 772, 779 ............................................................ 23

27
*Tatum v. City and County of San Francisco*
28     (9th Cir. 2006) 441 F.3d 1090, 1100 ........................................................ 22

*Velsicol Corporation v. Hyman*
   (D.Colo.1961) 103 F. Supp. 363, 366 ........................................................................11

## STATUTES

16 USCA 1531(c) ........................................................................................................16

16 USCA 1538 .............................................................................................................13

Ca. Penal Code §§ 596-600 .........................................................................................13

California Civil Code §1441 .........................................................................................11

California Civil Code §1667 .....................................................................................11, 14

Federal Rule of Civil Procedure Rule 56(d) ...........................................................passim

Ohio Revised Code, §959.131 .....................................................................................15

Ohio Revised Code, §959.99(e) ...................................................................................15

Pen. Code, §§ 597, 597t ..............................................................................................12

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1

2

3

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

4    Plaintiff Cincinnati Zoo & Botanical Garden (CZBG) asks this Court to rush to

5 judgment, filing a motion for summary judgment mere days after Defendants, The Gorilla

6 Foundation and Dr. Penny Patterson (TGF), appeared and filed their Answer.  Despite the

7 glaring fact that no discovery has been conducted and the parties have not even held their

8 Rule 26 conference, CZBG seeks to secure judgment in the hopes that a quick ruling will

9 preclude TGF from being able to defend itself.

10

11    The CZBG motion claims that pursuant to an agreement, and as the owner of

12 Ndume, it has the unrestricted right to transfer Ndume to CZBG.[1]  Their perception and

13 legal premise are that Ndume is a piece of property, nothing more.  Thus, they should be

14 able to treat him any way they wish, because ownership is all that matters.

15    TGF fundamentally disputes this premise.  Ndume is not an inanimate object.  He is

16 an intelligent, sentient being, with remarkable comprehension skills and self awareness.

17 As such, this Opposition essentially begins where the moving papers left off, filling in the

18 important details which CZBG intentionally omitted, which preclude summary judgment.

19

20    As asserted in the TGF answer, and particularly in their Affirmative Defenses, the

21 reality of the situation is that given his unique history and health conditions, the transfer

22 CZBG seeks will harm Ndume physically, emotionally, and could very easily be the direct

23

24 _____

25 [1] Remarkably, CZBG applauds (in Fn. 6) the hearsay assertions of PETA criticizing TGF care of

26 Ndume.  At the same time, CZBG conveniently fails to mention that in the 2015 Agreement, upon which it bases its entire action, CZBG expressly admitted inspecting the TGF premises and

27 Ndume, concluding that " 'Ndume' appears to be in good physical and mental condition." (Doc#1-3, p. 2)

28

1  cause of his premature death.[2]

2
3  Indeed, Ndume was transferred away from CZBG (and another zoo) at ten years of
4  age because he was uniquely ill-suited to the constant stresses attendant to the public life
5  of a zoo gorilla.  In these zoos, Ndume developed serious physical, behavioral and
6  emotional problems.  They manifested themselves in a rather obvious way.  Ndume would
7  repeatedly throw his own feces and regurgitated food at zoo keepers and patrons.

8  Keepers also found it difficult to fit him in with other gorillas, who inflicted serious
9  bite injuries.  Attempts to integrate him into the available gorilla populations failed,
10 leaving him isolated.  At the same time, Ndume also developed serious physical problems.
11 At CZBG, he was diagnosed with a form of colitis, many Strongyloides infections, and a
12 permanent parasitic infection called Balantidium coli.  Given his terrible history in both
13 public zoos, CZBG transferred him to TGF.

14 These zoo-caused physical and emotional problems were effectively solved upon
15 his arrival at the (non-public) TGF sanctuary.  Indeed, Ndume thrived at TGF for 27-years,
16 bonding emotionally with his caregivers, and acquiring the characteristics and norms of an
17 enculturated gorilla, such as using a toilet by himself, listening to music and routinely
18 communicating with humans.
19

20 Yet, even after decades of peaceful existence, Ndume, now an elderly gorilla at age
21 37, still responds poorly to strangers approaching him – which would again become a
22 serious problem should he be forced once again to live in a public zoo environment.  Even
23 so, despite multiple requests to address and try to resolve these issues, CZBG refused to
24 even discuss them, as reflected by the letter exchanges attached to the complaint, and the
25

26 [2] Even if the Court were to ignore the fact that Ndume is not a box, painting, or sculpture,
   following the CZBG "property" analysis, it would defeat the entire purpose of the contract (to
27 provide the best care possible for Ndume) to effectively destroy the property itself.
28

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1 | sudden filing of the complaint.[3]

2

3 | Transferring Ndume to CZBG as requested is problematic due to a number of factors including: his advanced age of 37, his three prior transfers, his family history, his Balantidium coli infection, the risks associated with moving him from a private sanctuary where he has thrived, to a public zoo environment where he fared extremely poorly, and moving from a highly enculturated environment to an public zoo environment, where he will be removed from his 27 year family of human caregivers, to be forced to somehow bond with a strange population of gorillas.

10 | Emotionally, the stress and anxiety arising from such a transfer under these circumstances would be extreme, and akin to a child being taken away from his or her family, and placed in an unknown and perceived hostile environment.  Physically, the inevitable stress and anxiety will very likely trigger a Balantidium coli outbreak, and could easily result in sudden, extreme and potentially disastrous consequences for Ndume, including his death.

16 | As set forth herein, TGF and independent, world-renown experts have expressed their opinions that the transfer CZBG seeks under the currently known circumstances will physically and emotionally harm Ndume, and could result in his death.  To be perfectly clear, TGF believes that this is the core issue in the case.[4]  Even so, CZBG downplays (or

---

[3] Shortly thereafter, when TGF sought basic Rule 56(d) discovery to explore the alleged CZBG plans for Ndume, the request was summarily denied. So, on one hand, CZBG blames TGF for his current, temporary isolation after Koko's recent death, but refuses to provide any information about whether, once again, they will try to integrate him (despite his age limitations) or isolate him in their public zoo. The primary difference is, at TGF he would remain with the human caregivers who have been there every day of his life for the past 27 years, with no public exposure. CZBG cannot offer any similar compensation.

[4] CZBG intentionally frames this dispute as contractual based upon the 2015 Agreement. In reality, the contract is secondary, at best. The 2015 Agreement, which voided all prior Ndume agreements upon execution, may be unilaterally cancelled by either party by giving the other 30-days written notice. (Doc#1-3, p. 4) This is likely why CZBG rushed into litigation before the (footnote continued)

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

1  willfully ignores) the serious risks they seek to create for Ndume.  In treating him as an

2  object, CZBG claims that it can do whatever it wants with Ndume, including kill him.

3

4  But Ndume is no ordinary chattel.  He is an animal, an endangered species and a

5  sentient being.  As such, California, Ohio and Federal law prohibit anyone – especially

6  CZBG – from harming him.  <u>The bottom line is that this Court should not order the</u>

7  <u>transfer of Ndume as requested by CZBG, if doing so will harm him, in direct</u>

8  <u>contravention of the intent of the parties, the law and public policy.</u>

9  The two TGF affirmative defenses (and Counterclaim) explain why CZBG is

10  legally prohibited from harming Ndume through its proposed transfer.  The moving papers

11  completely ignore these affirmative defenses, and glibly ask the Court to dismiss the

12  Counterclaim, without evidence or basis.  While CZBG is not obligated to negate the TGF

13  affirmative defenses in moving for summary judgment, **an affirmative defense will**

14  **prevent summary judgment where each element of the defense is supported by**

15  **evidence.**

16  Both affirmative defenses are fully supported by the evidence offered in this

17  Opposition.  First, the TGF affirmative defense of illegality prevents summary judgment.

18  That defense relies upon the law which provides that if the fulfillment of a condition in a

19  contract is unlawful, the contract is void.  A contract is unlawful if it is contrary to an

20  express provision of law or the policy of express law.  California and Ohio law and public

21  policy prohibit anyone from harming an animal.  Federal law and public policy prohibit

22  anyone from harming an engendered species.

23

24  TGF offers compelling evidence in the attached Shields, Courage, Thivillon,

25  Patterson and Nunes declarations, individually and collectively establishing that the

26  _____

27  parties had even seriously begun implementing the required conflict-resolution procedures
required by Paragraph 12 of the Agreement. (Doc#1-3, p. 4)

28

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

requested CZBG transfer will harm, and could even kill Ndume. As such, as a matter of law, the proposed transfer (to the extent it arises from the contract) would be unlawful, as explained in the Declarations provided, and summarized below:

- Dr. Christa Nunes, Ph.D., the Associate Director of Research and Care for TGF provides the medical records for Ndume maintained by TGF, received from CZBG and the Brookfield Zoo, where he was kept for the first 10 years of his life. These records reveal his serious medical conditions, poor health and serious emotional problems while living in these public facilities. She also sets forth additional risk factors from public records, which further explain why transferring Ndume would be dangerous for him, including the fact that the Association of Zoos & Aquariums (AZA) (of which CZBG is a member) documented problems with gorillas even younger than Ndume <u>dying in transport or shortly after</u>. They have <u>no experience</u> transferring a captive-born male gorilla of his age.

- Board Certified gastroenterologist (and Stanford professor) Dr. David Shields, M.D., who has treated both San Francisco Zoo and TGF gorillas for gastrointestinal issues, explains from a medical perspective, that the stresses involved in the proposed CZBG transfer could very likely trigger a severe and sudden Balantidium coli outbreak in Ndume, which could result in his death.

- Pierre Thivillon, a French Zoo Director and Gorilla expert explains that given his 44-years of experience raising gorillas and the known factors documented by the medical records of Ndume, the proposed CZBG transfer will likely cause Ndume such severe stress that he will likely suffer an acute attack of Balantidium coli, which could be fatal.

- Amos Courage, Director of Overseas Projects for the Aspinall Foundation – an organization with some of the most comprehensive gorilla knowledge and experience in the world – explains that gorillas carrying the Balantidium coli parasite (such as Ndume) are particularly at risk for severe health consequences from that infection. He further explains how the Aspinall Foundation lost a gorilla due to a Balantidium coli outbreak, and

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1  how it is one of the main causes of death for one group of gorillas.

2
3     • Dr. Penny Paterson, Ph.D., who is the TGF founder, renown for her interspecies
communication research with Koko, the primary caregiver for Ndume and an
4
acknowledged gorilla expert, explains the close, family bonds between Ndume and his
5
caregivers, developed over 27-years.  She further explains the enculturated environment in
6
which Ndume has lived and thrived for nearly three decades, and how transferring him
7
back to a public zoo environment will cause him immense fear and stress and as a result
8
could cause his death.
9

10     The TGF affirmative defense of impracticability similarly prevents summary
11  judgment.  That defense provides that a contractual condition that is impracticable need not
12  be performed.  A condition becomes impracticable when it can only be done at an
13  excessive and unreasonable cost.  Here the cost of transferring Ndume in the manner
14  requested by CZBG, which will cause him to suffer emotionally, and as a direct
15  consequence, may well result in his death, clearly falls into the category of an excessive an
16  unreasonable cost, making it impracticable.[5]

17
18     Given that transferring Ndume as CZBG proposes will injure him in contravention
of law, TGF respectfully requests that the CZBG motion be denied in its entirety.  Indeed,
19
CZBG chose not to address these central issues in its moving papers, despite attaching the
20
TGF letters and ignoring the TGF Rule 56(d) request to put the instant motion off calendar
21
to permit fundamental discovery into how CZBG proposed to avoid the precise risks
22

23
_____

24  [5] The shocking aspect of this entire proceeding is that there are only two possibilities.  One is that
CZBG is fully aware of the extreme risks their proposed transfer will create for Ndume…but they
25  simply do not care.  The other possibility is that while CZBG claims that it is a world-class
facility, with expertise in gorillas, their transfers, and what is best for Ndume, they actually did not
26  realize the life-threatening consequences of their proposed actions.  Either way, they should not be
entitled, by malice or neglect, to secure an order from this Court which will likely become a death
27  sentence for Ndume.

28

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA  91356

1  established by the attached declarations.  CZBG refused to continue the motion or even

2  discuss the issues with TGF.

3
4  Significantly, given the CZBG refusal to disclose their plans for Ndume, assuming

5  he would even survive their requested transfer, he could be exposed to even greater risks

6  than TGF currently knows.  For example, depending on how CZBG intends to house,

7  integrate and/or display Ndume, their actions may well result in additional, even greater

8  stressors than are now known, which could actually increase the likelihood of severe,

9  potentially fatal consequences for him.

10  In any event, if, despite the evidence provided in opposition, the Court is inclined to

11  grant this CZBG motion, pursuant to Rule 56(d) of the Federal Rules of Civil Procedure,

12  TGF requests that it be allowed to conduct discovery in order to present the full spectrum

13  of harm that is likely to befall Ndume from the seriously ill-conceived CZBG plan to

14  transfer him.  This is only fair, since TGF requested this information from CZBG, before

15  and after this motion was filed, and the zoo had repeatedly refused to provide it.

16
17  ## FACTUAL BACKGROUND

18  Ndume is a 37-year old male Western Lowland Gorilla, born in 1981 at CZBG.

19  (Doc#1-3, pp. 2-3; Nunes Dec., ¶6)   To date, Ndume has been transferred between

20  facilities three times. (Nunes Dec., ¶6)  CZBG first transferred Ndume to the Brookfield

21  Zoo in Chicago. (Nunes Dec., ¶6)  Brookfield later transferred him back to CZBG.  (Nunes

22  Dec., ¶6)  Finally, CZBG transferred Ndume to TGF in 1991. (Nunes Dec., ¶6)

23
24  Ndume fared poorly while in the prior Zoos.  (Nunes Dec., ¶¶7-15)  He suffered

25  from projectile vomiting.  (Nunes Dec., ¶10)  He repeatedly threw his own feces and

26  regurgitated food at zoo staff and the public.[6]  (Nunes Dec., ¶11, 14)  CZBG admits that

27
28  [6] This is particularly a problem since humans may contract Balantidium coli from being exposed
(footnote continued)

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1  Ndume "developed a throwing behavior" in his early years. (Doc#1-8, p. 3) Ndume

2  suffered from health issues such as colitis and many Strongyloides infections. (Nunes

3  Dec., ¶7) Ndume further acquired a permanent parasitic condition that infects gorillas

4  called Balantidium coli. (Nunes Dec., ¶8)

5

6  Ndume was also unable to coexist peacefully with other zoo gorillas. (Nunes Dec.,

7  ¶9) Ndume sustained numerous bites and wounds in altercations with other gorillas.

8  (Nunes Dec., ¶¶9, 13) As a result of his problems, Ndume was isolated from other gorillas

9  and lived alone. (Nunes Dec., ¶¶13-14, 41)

10  CZBG loaned Ndume to TGF pursuant to a 1991 written agreement (1991

11  Agreement). (Doc#1-3) Once at the TGF sanctuary, Ndume thrived. (Patterson Dec.,

12  ¶¶5-7) While at TGF, Ndume was not on public display like the prior zoos. (Patterson

13  Dec., ¶5(a)) Rather, his life is one of play and enrichment. (Patterson Dec., ¶¶ 5-7) The

14  stress behaviors Ndume manifested in the two prior zoo environments ceased while at

15  TGF. (Patterson Dec., ¶5(d)) The Balantidium coli subsided while at TGF and was not a

16  problem. (Patterson Dec., ¶5d) However, to this day Ndume reacts poorly to unknown

17  people approach his enclosure. (Nunes Dec., ¶45, Patterson Dec., ¶6(c))

18  Ndume has now been at TGF for 27 years. (Patterson Dec., ¶5) During this time,

19  he has bonded with his human caregivers and become enculturated, meaning that he has

20  gradually acquired the characteristics and norms of human culture. (Patterson Dec., ¶¶5-7)

21  For example, Ndume communicates with humans via vocalizations, natural gestures and

22  some ASL signs (sign language), uses one of several toilets available to him, listens to

23  music, celebrates birthdays and holidays (and receives gifts) and listens to books read to

24  him (and responds to the stories). (Patterson Dec., ¶¶6-8) He also spends his time

25  engaging in a variety of stimulating enrichment activities. (Patterson Dec., ¶¶6-7)

26

27  to the feces of an infected gorilla.

28

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

1    In or around 2015, CZBG and TGF executed a new agreement (2015 Agreement)

2  concerning Ndume. (Doc#1-3) The 2015 Agreement "supersede[d] and ma[de] void" any

3  and all prior agreements. (Doc#1-3, p. 4) CZBG recognized in the 2015 Agreement that,

4  as the owner of Ndume, it was responsible for making sure that its care of Ndume

5  complied with "laws governing primates...." (Doc#1-3, p. 2) CZBG further confirmed (in

6  the agreement) that Ndume was "in good physical and mental condition." (Doc#1-3, p. 2)

7
     The 2015 Agreement required the parties themselves to be "responsible for
8
   resolving any conflicts" arising from the agreement. (Doc#1-3, p. 4) The 2015 Agreement
9
   gave TGF the right to terminate the agreement, providing that "the Gorilla Foundation
10
   shall have the option of terminating this agreement by giving the other 30 days written
11
   notice." (Doc#1-3, p. 4)
12

13    The 2015 Agreement allowed the Gorilla Species Survival Plan (GSSP) and CZBG

14  to transfer Ndume upon the death of Koko. (Doc#1, Ex B, p.1) Koko died on June 19,

15  2018. (Patterson Dec., ¶8(b)) The GSSP advised TGF that it intended to transfer Ndume

16  to CZBG. (Doc#1-4, p. 2)

17
     Pursuant to the conflict resolution portions of the 2015 Agreement, TGF engaged
18
   CZBG and the GSSP in a dialogue to discuss their proposed transfer and to learn
19
   additional information concerning the transfer to CZBG. (Doc#1-6, #1-8, #1-9) CZBG
20
   flatly refused to disclose its plans to TGF, and immediately filed the instant action rather
21
   than continue discussions. (Doc#1-8)
22

23                              **LEGAL DISCUSSION**

24

25  **I.    SUMMARY JUDGMENT IS IMPROPER WHERE AFFIRMATIVE
         DEFENSES ARE SUPPORTED BY EVIDENCE.**

26    "A plaintiff moving for summary judgment is not obligated to negate affirmative

27  defenses, **but an affirmative defense will negate summary judgment where each**

28  **element of the affirmative defense is supported by summary judgment evidence.**

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1  *McCollough v. Johnson, Rodenberg & Lauinger* (D. Mont. 2008) 587 F.Supp.2d 1170,

2  1176; *Velsicol Corporation v. Hyman* (D.Colo.1961) 103 F. Supp. 363, 366 ["A plaintiff's

3  motion for summary judgment **must be denied** if affirmative defenses raise matters,

4  which, if proven, may possibly preclude a judgment in favor of the plaintiff as a matter of

5  law …"][7]

6
7  Since TGF offers evidence supporting each element of the affirmative defenses of

8  illegality and impracticability pled in their Answer (Doc#18, ¶¶83, 84), summary judgment

9  is improper.

10  **II.    THE AFFIRMATIVE DEFENSE OF ILLEGALITY PREVENTS SUMMARY
          JUDGMENT.**

11
12      **A.    Unlawful Contractual Conditions Are Void.**

13  As California Civil Code §1441 explains, a contractual condition which is **unlawful**

14  is void:[8]

15
16  "IMPOSSIBLE OR UNLAWFUL CONDITIONS VOID. A condition in a

17  contract, the fulfillment of which is impossible or unlawful, within the

18  meaning of the Article on the Object of Contracts, or which is repugnant to

19  the nature of the interest created by the contract, is void."

20
21  Unlawfulness is defined in California Civil Code §1667:

22  "That is not lawful which is:

23
24  ―――――――――――――――――

25  [7] All emphasis in quoted material is added unless otherwise noted.

26  [8] "A contract made contrary to public policy or against the express mandate of a statute may not
    serve as the foundation of any action, either in law or in equity [citation omitted], and the parties

27  will be left, therefore, where they are found when they come to a court for relief." *Tiedje v.
    Aluminum Taper Milling Co.* (1956) 46 Cal.2d 450, 453–454.

28

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

1. Contrary to an express provision of law;

2. Contrary to the policy of express law, though not expressly prohibited; or,

3. Otherwise contrary to good morals."

**B.     Pursuant to California and Federal Law, It is Unlawful to Harm Any Animal, Especially an Endangered Species.**

    **1.     California Law.**

The Animal Cruelty law enacted by the California Legislature is comprehensive, yet simple. *Animal Legal Defense Fund v. California Exposition & State Fairs* (2015) 239 Cal.App.4th 1286, 1290 recently summarized the import of this law, which makes it a crime to harm an animal through an intentional act:

**"California's Animal Cruelty Law**

<u>Under California's animal cruelty laws, it is a crime to cause harm to an</u> <u>animal **through an affirmative act or an act of neglect**</u> …. (Pen. Code, §§ 597, 597t.)

In fact, as *Martinez v. Robledo* (2012) 210 Cal.App.4th 384, 392 makes clear, animal owners have an affirmative duty to properly care for animals:

"[A]n owner has an affirmative duty to properly care for an animal. There are dozens of other laws **criminalizing the mistreatment of animals** [Fn.

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1  omitted]." [9]

2

3  **2.    Federal Law.**

4  Since Ndume is a Gorilla and a recognized endangered species under the
5  Endangered Species Act (ESA), additional Federal protections regarding his care exist.  16
6  USCA 1538 entitled "Prohibited Acts" provides, in relevant part:
7

8      "(a) Generally

9

10      (1) Except as provided in sections 1535(g)(2) and 1539 of this title, with
11      respect to any endangered species of fish or wildlife listed pursuant to
12      section 1533 of this title **it is unlawful for any person subject to the**
13      **jurisdiction of the United States to--**

14                                    *        *        *

15      (B) **take any such species** within the United States or the territorial sea of
16      the United States;"[10]

17

18  The term "take" is defined by 16 USCA 1532:

19

20      "(19) The term 'take' means to **harass**, **harm**, pursue, hunt, shoot, **wound**,
21      **kill**, trap, capture, or collect, or to attempt to engage in any such conduct."

22

23      Read  together,  it  is  unlawful  for  any  person  to  harm  an  endangered  species

---

24  [9]  California's animal cruelty laws are found at Ca. Penal Code §§ 596-600 and contain over 50
25  specific penal code section restricting almost every kind of harm to animals.  Ndume is located in
    California and any proposed transfer would be governed by California law.  If for any reason he is
26  transferred, Ohio Animal Cruelty Penal Codes would apply, but are not nearly as relevant as
    controlling Federal law.

27  [10]  Gorillas are listed an endangered pursuant to 16 USCA 1633(c).

28

1 | anywhere within the United States.[11]

2
3 | **C.   Pursuant to Public Policy, It is Unlawful to Harm an Animal, Especially an Endangered Species.**

4 | The law does not require that a contractual condition violate an express statutory
5 | mandate to be unlawful since such a condition may be declared void if it is contrary to
6 | public policy. *Altschul v. Sayble* (1978) 83 Cal.App.3d 153, 161–162; Cal. Civ. Code,
7 | §1667. As *Kashani v. Tsann Kuen China Enterprise Co.* (2004) 118 Cal.App.4th 531, 540
8 | explains:

9
10 | "As one authority has noted, '[t]he law has a long history of recognizing the
11 | general rule that certain <u>contracts, though properly entered into in all other</u>
12 | <u>respects, will not be enforced, or at least will not be enforced fully, if found</u>
13 | <u>to be contrary to public policy.</u>' "

14
15 | **1.   California Public Policy.**

16 | California recognizes a strong policy of protecting animals from harm, as noted by
17 | the foregoing authorities. Animals are no longer considered mere chattels, which may be
18 | treated any way an owner desires. Perhaps CZBG is not in agreement, or even aware, but
19 | as stated to *Martinez v. Robledo* (2012) 210 Cal.App.4th 384, 392 the California
20 | Legislature set clear public policy concluding that animals are "special sentient beings"
21 | who must be "specially protected":

22
23 | "<u>In California, the Legislature has recognized since 1872 that animals are</u>
24 | **<u>special, sentient beings</u>**, <u>because unlike other forms of property, animals</u>
25 | <u>feel pain, suffer and die</u>. Civil Code section 3340 provides that "[f]or
26 | wrongful injuries to animals being subjects of property, committed willfully

27 | [11] Violations of the ESA may result in either civil or criminal liability per 16 U.S.C.A. §1540.
28

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

or by gross negligence, in disregard of humanity, exemplary damages may be given." Laws criminalizing animal abuse underscore <u>the Legislature's view that animals are a distinct and **specially protected form of property**</u>.

*   *   *

<u>Given the Legislature's historical solicitude for the proper care and treatment of animals, and the array of criminal penalties for the mistreatment of animals, as well as the reality that animals are living creatures</u>, the usual standard of recovery for damaged personal property—market value—is inadequate when applied to injured pets."

### 2.   Ohio Public Policy.

To the extent it is relevant, the Ohio public policy of protecting animals from harm is best evidenced by the 2016 revision to the Ohio Revised Code known as Goddard's Law (Ohio House Bill 60).   These revisions strengthened Ohio animal cruelty laws by prohibiting anyone from causing "physical harm" to or committing an "act of cruelty" against a companion animal.  Ohio Revised Code, §959.131.  Plus, the Ohio Legislature made the penalty for a violating this law a felony.  Ohio Revised Code, §959.99(e).

While Goddard's law does not apply to wild animals such as Ndume, it reflects a recent intention to increase the Ohio public policy of protecting animals from acts of harm or cruelty.  Moreover, by making a violation of such laws a felony, Ohio is signaling that it takes harm to animals very seriously and intends to punish violators severely.

### 3.   Federal Public Policy.

"The U.S. Endangered Species Act of 1973 ... was enacted to provide for conservation of domestic and endangered species ...." *Fouke Co. v. Brown* (E.D. Cal. 1979) 463 F.Supp. 1142, 1144.  The policy behind the ESA is set forth in the statute itself,

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1  and found at 16 USCA 1531(c):

2

3     "(c) Policy

4

5     (1) It is further declared to be the <u>policy of Congress that all Federal</u>
<u>departments and agencies shall seek to conserve endangered species</u> and

6

7     threatened species and shall utilize their authorities in furtherance of the

8     purposes of this chapter."

9

10  Some courts, including the court in *Center for Biological Diversity v. Norton* (D.

11  Ariz. 2003) 304 F.Supp.2d 1174, 1178, have found that the protection of endangered

12  species must be afforded the highest priorities:

13    " 'Congress has spoken in the plainest of words, making it abundantly clear

14    that the balance [of equities] has been struck in favor of affording

15    endangered species the highest of priorities.' [Citation omitted]"

16

17  **D.    The CZBG Requested Transfer of Ndume is Unlawful Since it**
    **Violates Express Provisions of Law and is Against Public Policy.**

18  "Whether a contract is illegal or contrary to public policy is a question of law to be

19  determined from the circumstances of each particular case." *Jackson v. Rogers & Wells*

20  (1989) 210 Cal.App.3d 336, 349–350. Here, the evidence TGF offers in connection with

21  this motion set forth in the Shields, Courage, Thivillon, Nunes and Patterson declarations

22  establishes that the intended CZBG transfer will unquestionably harm Ndume in violation

23  of the quoted laws and public policy.[12]

24

25

26  [12] Plus, CZBG well knows that it is bound by the applicable laws, which was acknowledged in the

27  very first sentence of the 2015 Agreement: "As the owning institution of 1.0 western lowland
    gorilla, "Ndume," currently housed at the Gorilla Foundation (TGF), the Cincinnati Zoo &

28  (footnote continued)

1   Dr. David Shields, M.D. is a Board Certified gastroenterologist in California, who
2   has been in practice for over 35-years.  (Shields Dec., ¶2) He was the prior Director of
3   Endoscopy at Stanford University Medical, and is a current Clinical Associate Professor of
4   Medicine at Stanford University.  (Shields Dec., ¶2)  While he primarily treats human
5   patients, he has critical experience treating gorillas with gastrointestinal issues and
6   advising as to their care. (Shields Dec., ¶¶3-4)He is a medical consultant for the gorilla
7   population at the San Francisco Zoo, and has treated their gorillas.  (Shields Dec., ¶3) Dr.
8   Shields is also a medical consultant for TGF gorillas, and previously treated Koko.
9   (Shields Dec., ¶4)

10   Dr. Shields is familiar with the problem of Balantidium coli and gorillas.  (Shields
11   Dec., ¶7)  He confirms that stress is one of the most significant factors in causing a
12   Balantidium coli outbreak, which can come on very quickly and result in serious
13   consequences to a gorilla, including death. (Shields Dec., ¶¶7-8) Dr. Shields expects the
14   stress on Ndume attendant to the proposed CZBG transfer will likely trigger a severe
15   Balantidium coli outbreak.  (Shields Dec., ¶9)  Given his history, age and the likely
16   stressors Ndume will face in the transfer, Dr. Shields believes that these Balantidium coli
17   symptoms could easily come on quickly, cause significant complications, and ultimately
18   result in his death. (Shields Dec., ¶9)

20   Amos Courage is the Overseas Projects Director for the Aspinall Foundation – a
21   British charity that owns and operates two zoos.  (Courage Dec., ¶¶2-3) The Aspinall
22   Foundation currently cares for 46 gorillas. (Courage Dec., ¶4)  The Foundation work with
23   gorillas is comprehensive, and covers all aspects of gorilla life, including: breeding (145
24   gorillas have been born at their zoos), raising, transferring, and reintroducing gorillas to the
25   wild. (Courage Dec., ¶¶4-5)

---

Botanical Garden (CZBG) is responsible for ensuring that proper case is being administered based
in industry best practices and **laws governing primates** in captive settings." (Doc#1-3, p. 2)

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

Given their experience with numerous gorillas, the Aspinall Foundation is very familiar with the Balantidium coli parasite. (Courage Dec., ¶¶6-7)  The Foundation knows that gorillas are extremely susceptible to Balantidium coli when they are stressed or depressed. (Courage Dec., ¶6)  Balantidium coli not only contributed to the death of one of their gorillas, but it is one of the main causes of death for young orphaned wild gorillas. (Courage Dec., ¶6)

Pierre Thivillon is (and has been since 1972) the Director of the Zoological Park of Saint-Martin-La-Plaine, which houses over 1,000 animals, representing over 100 different species. (Thivillon Dec., ¶2)  Mr. Thivillon has extensive experience with animals generally, and his specific experience with gorillas and other primates goes back 44 years. (Thivillon Dec., ¶¶2-6)  Currently, Mr. Thivillon cares for 12 gorillas, including a 20-year old gorilla he and his wife hand-reared from birth. (Thivillon Dec., ¶¶4-5)

It is the opinion of Mr. Thivillon that the sedation required to transfer Ndume could very well harm him given that anesthesia is risky with older gorillas such as Ndume.[13] (Thivillon Dec., ¶8(a))  Mr. Thivillon further believes that, given his experience with the fragility of gorillas, who are upset by even minor changes in their daily routines, permanently breaking the 27-year family bonds Ndume formed with his caregivers at the private TGF sanctuary and thrusting him into a life of public zoo exhibition will cause Ndume extreme stress and anxiety. (Thivillon Dec., ¶¶6, 8(b, d))

Mr. Thivillon also expects that this level of stress and anxiety will cause Ndume to experience acute attacks of Balantidium coli.  (Thivillon Dec., ¶8(e))  Ultimately, Mr. Thivillon believes that given all of the relevant circumstances of which he is aware, an acute attack of Balantidium coli is likely and could be fatal for Ndume. (Thivillon Dec., ¶8(e))

---

[13] TGF provides a certified translation of the Declaration of Mr. Thivillon.

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1   Dr. Penny Paterson, Ph.D. is an expert in the field of interspecies communications

2   who co-founded TGF in 1976. (Patterson Dec., ¶2)  She has been the primary caregiver to

3   Ndume for all 27-years since he arrived at TGF in 1991. (Patterson Dec. ¶5(a, b))  Dr.

4   Patterson personally witnessed all the behavioral and emotional problems Ndume

5   exhibited in the prior zoos cease during his time at the peaceful and quiet (non-public)

6   sanctuary. (Patterson Dec., ¶5)  She also witnessed his Balantidium coli symptoms subside

7   and never present a problem while at TGF. (Patterson Dec., ¶5)

8
9   Dr. Patterson explains how Ndume has become enculturated over the last 27-years.

10  (Patterson Dec., ¶¶6, 7)  He communicates with humans through vocalizations, natural

11  gestures and some ASL signs.   (Patterson Dec., ¶6(e))  He celebrates holidays and

12  birthdays, and receives custom-made decorations, gifts and foods. (Patterson Dec., ¶7(b))

13  Ndume likes to listen to music while playing, and listens to books read to him.  (Patterson

14  Dec., ¶7)

15  As the person who knows him best, Dr. Patterson is extremely concerned about the

16  proposed CZBG transfer, the stress that will cause to Ndume and the results of that stress.

17  (Patterson Dec., ¶8)  Specifically, Dr. Patterson fears that if Ndume is transferred, the

18  cumulative loss of everything he has known for the past 27-years (his family, caregivers,

19  friends, home, diet, personalized care and attention, and many more aspects of his enriched

20  and enculturated life) will trigger a Balantidium coli outbreak that could be fatal.

21  (Patterson Dec., ¶8)

22
23  Dr. Christa Nunes, Ph.D. is the Associate Director of Research and Care for TGF.

24  (Nunes Dec., ¶2)  Her expertise is in gorilla care, interspecies communication research,

25  and biomedical engineering.  (Nunes Dec., ¶3)  Dr. Nunes lays the foundation for the

26  medical records revealing that Ndume fared extremely poorly at CZBG and at the

27  Brookfield Zoo in Chicago.   (Nunes Dec., ¶5)  Those records establish his Balantidium

28  Coli diagnoses and several other serious physical and behavioral problems, including

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

1   projectile vomiting, repetitively throwing his vomit and feces at caregivers and the public,

2   and injuries he suffered from other gorillas.  (Nunes Dec., ¶5)

3

4   Her declaration also explains that additional risk factors exist (in addition to those

5   discussed above) as shown in public AZA records, that make transferring Ndume

6   problematic.  (Nunes Dec., ¶¶15, 20, 24, 30, 37, 42, 46)  For example, she notes that the

7   AZA has no experience transferring captive-born male gorillas at his age, and the AZA has

8   experienced problems with transfer of gorillas even younger than Ndume, resulting in their

9   deaths during transport or shortly thereafter.  (Nunes Dec., ¶¶16-20, 31-37)  She further

10  notes that heredity may present a factor as well, inasmuch as family members of Ndume

11  have also not fared well in zoos.  (Nunes Dec., ¶¶21-24)  She finally points to concerns

12  about integrating Ndume with other gorillas and zoo patrons  (Nunes Dec., ¶¶38-46)

13  Given all of the foregoing evidence, the proposed CZBG transfer would be

14  unlawful.  It would knowingly threaten the existing good health and peaceful existence that

15  Ndume enjoys at TGF, putting him at great risk of serious emotional and physical

16  consequences, which every knowledgeable expert has opined could result in his death.

17  Under these circumstances, CZBG should not be allowed to blindly enforce the 2015

18  Agreement as proposed.  To do so, would harm Ndume in violation of all of the relevant

19  and applicable laws and public policies.

20

21  The best place for Ndume to stay for the remaining few years of his life is with the

    caregivers he has known for 27 years, at the peaceful TGF sanctuary.

22

23  **III.   THE AFFIRMATIVE DEFENSE OF IMPRACTICABILITY PREVENTS
         SUMMARY JUDGMENT.**

24       **A.   Impracticability Discharges a Contractual Duty of a Party.**

25

26  The California Supreme Court in *City of Vernon v. City of Los Angeles* (1955) 45

27  Cal.2d 710, 719–720 recites the history of this long-standing defense, and explains what it

28  means for something to be "impracticable" such that performance under a contract is

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

1  discharged:

> "The controlling principles as to legal impossibility excusing performance
> have been long recognized in this state and are stated in *Mineral Park Land*
> *Co. v. Howard* (1916), *supra*, 172 Cal. 289, 293, 156 P. 458, L.R.A.1916E,
> 1, where defendants contracted to take gravel from plaintiff's land at a certain
> price, and it was subsequently found that the gravel, although present, could
> be taken only at prohibitive cost: 'A thing is impossible in legal
> contemplation when it is not practicable; and <u>a thing is impracticable when it</u>
> <u>can only be done at an **excessive and unreasonable cost**</u>. [Citation omitted]'
> "[14]

**B.      Enforcing the Contract as Requested by CZBG is Impracticable.**

While this defense is mostly discussed in terms of an unreasonable monetary cost, it
is no less applicable in the current context where Ndume will face unreasonably severe
consequences, should CZBG be permitted to forcibly transfer him back to a public zoo
environment.  Ndume could well pay the "ultimate price."  But, the consequences, socially,
of violating the public policies of both California and Ohio, while simultaneously ignoring
Federal law, are not just unlawful, such actions would also be "excessive and
unreasonable" under the circumstances.

As detailed in the Shields, Courage, Thivillon, Patterson and Nunes declarations,
enforcing the 2015 Agreement in the manner requested by CZBG can only be done at the
unreasonable cost of risking the emotional and physical health of Ndume. As such, taking

---

[14] As *Maudlin v. Pacific Decision Sciences Corp.* (2006) 137 Cal.App.4th 1001, 1017, fn. 6 notes,
" 'The Second Restatement consolidates the subjects of impracticability and frustration of purpose,
substituting the term 'impracticability' for 'impossibility' as better expressing the extent of the
increased burden required.' [Citation omitted] "

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA  91356

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

1 these actions would violate numerous animal cruelty laws, and the strong public policy
2 underpinning those laws.   Under these circumstances, TGF should be excused from
3 performance by the doctrine of impracticability.

4
5 **IV.   THE COURT SHOULD ALLOW DEFENDANTS TO CONDUCT
       DISCOVERY UNDER FRCP RULE 56(D).**

6       If the Court is considering granting this motion, Rule 56(d) [previously FRCP 56(f)]
7 is relevant here.   It provides:

8
9       **"(d) When Facts Are Unavailable to the Nonmovant.** If a nonmovant
10      shows by affidavit or declaration that, for specified reasons, it cannot present
11      facts essential to justify its opposition, the court may:

12
13      **(1)** defer considering the motion or deny it;

14
15      **(2)** allow time to obtain affidavits or declarations or to take discovery; or

16
17      **(3)** issue any other appropriate order."

18
19      *Tatum v. City and County of San Francisco* (9th Cir. 2006) 441 F.3d 1090, 1100
20 clarifies the burden on a party seeking a Rule 56(d) request must meet:

21      "A party requesting a continuance pursuant to Rule 56(f) must identify by
22      affidavit the specific facts that further discovery would reveal, and explain
23      why those facts would preclude summary judgment."

24
25      Here, the burden on TGF to support its Rule 56(d) request is greatly lessened given
26 that CZBG filed its summary judgment motion mere days after the TGF appearance and
27 Answer.   Generally, "<u>a district court **should** continue a summary judgment motion</u> upon a
28 good faith showing by affidavit that the continuance is needed to obtain facts essential to

MEMORANDUM OF POINTS AND AUTHORITIES OF DEFENDANTS IN OPPOSITION TO MOTION FOR
SUMMARY JUDGMENT

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1  preclude summary judgment." *State of Cal., on Behalf of California Dept. of Toxic*
2  *Substances Control v. Campbell* (9th Cir. 1998) 138 F.3d 772, 779.

3
4      As *Burlington Northern Santa Fe R. Co. v. Assiniboine and Sioux Tribes of Fort*
5  *Peck Reservation* (9th Cir. 2003) 323 F.3d 767, 773 explains, a Court should grant a Rule
6  56(d) request "fairly freely" in response to early-filed summary judgment motions, i.e.
7  before the opposing party could conduct discovery:

8      "Where, however, a summary judgment motion is filed so early in the
9      litigation, before a party has had any realistic opportunity to pursue
10     discovery relating to its theory of the case, <u>district courts should grant any</u>
11     <u>Rule 56(f) motion **fairly freely**</u>. [Citation omitted]"

12

13     With the foregoing guidance, TGF easily meets its burden to justify a continuance
14  of the instant motion, if necessary.  CZBG filed its summary judgment motion before any
15  discovery could be conducted, even before the parties could hold their Rule 26
16  Conference.

17
18     Even at this early stage of the litigation, Defendants knew that Ndume will suffer
19  severe negative consequences if the Court were to permit CZBG to forcibly take him from
20  his (non-public) home and family of 27-years and return him to a life of public display
21  where he previously performed poorly.  His medical history makes such actions
22  remarkably dangerous for him.

23     However, the severity of those consequences could increase, or possibly decline,
24  depending upon the CZBG plans for Ndume after his return to CZBG.  While TGF
25  requested information about these factors before CZBG filed suit and asked that CZBG
26  continue its summary judgment motion (obviously after suit was filed) to permit discovery
27  of these facts, CZBG refused to share its plans for Ndume with TGF and refused to
28  continue its motion.  (Casselman Dec., ¶5)

CASSELMAN LAW GROUP
5567 RESEDA BOULEVARD, SUITE 330
TARZANA, CALIFORNIA 91356

1    Specifically, TGF needs to know facts such as what the housing and living

2    conditions of Ndume would be at CZBG, whether CZBG would attempt to integrate

3    Ndume with other gorillas, whether that would be with male or female gorillas, how many

4    gorillas Ndume would be integrated with, their ages, how that integration would be

5    accomplished, if at all, how close Ndume would be housed to other gorillas, the type of

6    contact Ndume would have with other gorillas, if at all, caregivers, and if Ndume would be

7    on public display. (Casselman Dec., ¶¶10-15)

8
     These facts, which CZBG would clearly have to provide in discovery, could alone
9
     preclude summary judgment. For example, if CZBG intends to keep Ndume adjacent to,
10
     but separated from, other gorillas, how is that less problematic than his current isolation
11
     from other gorillas at TGF. Keeping him near, but unable to be with other gorillas,
12
     particularly females, would significantly increase his stress levels and greatly increase the
13
     chance of his premature death. Similarly, if CZBG intends to integrate Ndume with
14
     younger male gorillas, this poses a physical risk to his safety because CZBG gorillas could
15
     easily attack and kill Ndume.
16

17    Other facts may exist that TGF is currently unaware of which might preclude

18   summary judgment. As *Burlington Northern Santa Fe R. Co. v. Assiniboine and Sioux*

19   *Tribes of Fort Peck Reservation* (9th Cir. 2003) 323 F.3d 767, 774 makes clear, since no

20   discovery has taken place, TGF should be given some leave in connection with its Rule

21   56(d) request:

22
     "Further, where, as in the present litigation, no discovery whatsoever has
23
     taken place, the party making a Rule 56(f) motion cannot be expected to
24
     frame its motion with great specificity as to the kind of discovery likely to
25
     turn up useful information, as the ground for such specificity has not yet
26
     been laid."
27

28

1   Thus, as set forth in detail in the attached Casselman Declaration, if this Court is

2   inclined to grant summary judgment, TGF should be given a reasonable opportunity to

3   obtain these, and possibly other, facts that could defeat the instant motion.  (Casselman

4   Dec., ¶¶3-15)

5

6   ## CONCLUSION

7   For all the reasons set forth herein, Defendants request that the Court deny the

8   CZBG Motion in its entirety.  If the Court is inclined to grant the motion, Defendants

9   request that the Court continue the motion to allow Defendant to conduct discovery in

10  order to present additional facts that could defeat summary judgment.

11

12  DATED: Deember 13, 2018          **CASSELMAN LAW GROUP**
                                     DAVID B. CASSELMAN
13                                   DAVID POLINSKY
                                     KIRK S. COMER
14

15                                   By: _____/s/ David B. Casselman_____
                                              DAVID B. CASSELMAN
16                                   Attorneys for Defendant and Counterclaimant The
                                     Gorilla Foundation and Defendant Dr. Francine
17                                   Patterson

18  DATED: Deember 13, 2018          **COTCHETT PITRE & McCARTHY LLP**
                                     FRANK M. PITRE
19                                   JULIE L. FIEBER

20

21                                   By: _____/s/ Frank M. Pitre_____
                                              FRANK M. PITRE
22                                   Attorneys for Defendant and Counterclaimant The
                                     Gorilla Foundation and Defendant Dr. Francine
23                                   Patterson

24

25

26

27

28